UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-62503-CIV-COHN/SELTZER

HILDA ESPINOSA,

    Plaintiff,

vs.

BURGER KING CORPORATION,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment [DE 13] and Plaintiff's Cross-Motion for Summary Judgment [DE 18]. The Court has carefully considered the motions, responses, and replies, as well as the parties' factual statements and record submissions, and is otherwise fully advised in the premises.

**I.**    **Material Facts**

On February 15, 2008, Kelly Elliot, a Company Business Manager for Defendant Burger King Corporation ("BKC"), hired Plaintiff Hilda Espinosa as an Assistant Manager. In April 2008, Elliot assigned Espinosa to be the acting General Manager of BKC Restaurant Number 39 (the "Restaurant") in Fort Lauderdale. In July 2008, Elliot officially promoted Espinosa to the General Manager position.

In early November 2008, Espinosa attended BKC's three-day Operations Excellence Conference in Atlanta. That conference brings together General Managers from the Southeast region. At the conference, Espinosa was assigned to share a double hotel room with Carmen Deliz, another BKC General Manager.

On November 4, 2008, Espinosa attended a team dinner with Elliot, Deliz, and several other BKC managers.  Espinosa claims that during dinner, some of the managers, including Elliot, Deliz, and Omar Haber, disclosed that they were gay or lesbian and proceeded to discuss various sexual matters.  See DE 15-1 at 19-21.  Espinosa recalls the dinner lasting about forty minutes.  See id. at 20.  For a short time after dinner, Espinosa visited a nightclub with the other managers.  Espinosa then returned to her hotel room and went to sleep around 10:00 p.m.

At about 2:00 a.m. the next morning, Espinosa alleges that Deliz and Haber knocked on the hotel-room door, and Espinosa let them in.  See DE 15-1 at 22.  Espinosa claims that she tried to go back to sleep but that Deliz, who was very intoxicated, woke Espinosa up.  See id. at 23.  Another male BKC manager then knocked on the door, and Haber let him in.  See id.  According to Espinosa, the two men (who were also intoxicated) embraced with their shirts off and spoke sexually to each other.  See id. at 23-24.  Haber indicated that the two men planned to sleep in Espinosa's bed, and Haber and Deliz suggested that Espinosa sleep with Deliz in her bed.  See id. at 23-26.  Further, Espinosa claims that Deliz jumped on her bed, quickly exposed her breasts and buttocks to Espinosa, and proceeded to pass out in the bed.  See id. at 23-25.  Espinosa described Deliz as "[k]nocked out completely."  Id. at 25.  After these events, which lasted a total of five to ten minutes, Espinosa left the room and went to sleep in another manager's room.  See id. at 25-27.[1]

---

[1] The record includes affidavits from Haber and Deliz, which appear to present a very different version of the events in the hotel room.  See DE 15-3 at 48-53.  According to both Haber and Deliz, Espinosa was awake and watching television when they entered the room.  Espinosa argued with Deliz because she had not returned to the room with Espinosa earlier.  Haber and Deliz decided to order food, and Espinosa did not object.  A few minutes later, Espinosa said that she was having "PMS," that Haber

2

Shortly after the hotel-room incident, Espinosa reported the other managers' alleged conduct to Elliot, who said that she would ask Haber and Deliz to apologize to Espinosa. Espinosa was upset with Elliot's response because she felt that Haber and Deliz should be suspended for at least a week. Soon thereafter, Haber and Deliz apologized to Espinosa.

Espinosa claims that after she reported the hotel-room incident, Elliot began to find fault with Espinosa's work performance. In this regard, the parties offer substantially different accounts of Espinosa's performance during her tenure as General Manager at the Restaurant.

BKC contends that both before and after the Atlanta conference, BKC supervisors, including Market Manager Jesus Perez (Elliot's supervisor), visited the Restaurant several times and identified numerous problems. BKC further claims that during Espinosa's management, the Restaurant performed poorly in evaluations that considered safety, health violations, cleanliness, sales, and other business matters. In January 2009, Elliot placed Espinosa on a 90-day personal improvement plan. According to BKC, Elliot, Perez, and other BKC management decided to terminate Espinosa after she failed to meet the requirements of that plan. On May 8, 2009, Elliot terminated Espinosa's employment with BKC.

By contrast, Espinosa maintains that during her tenure as General Manager, she significantly improved the Restaurant's sales and profits, as well as its operational performance. Espinosa further asserts that she was awarded a merit-based pay

---

and Deliz were being loud, and that Espinosa was going to the other manager's room to sleep. Haber and Deliz deny making any inappropriate comments to Espinosa. In her deposition, Espinosa disputed this version of events. See id. at 69.

3

increase in October 2008 and that she received a commendation from Elliot in March 2009.  Espinosa contends that Perez never evaluated her Restaurant and that he and others manufactured evidence of her poor performance after she was terminated.[2]  Moreover, Espinosa claims that gay and lesbian managers—including Deliz, who eventually replaced Espinosa at the Restaurant—were allowed to keep their positions even though their restaurants performed significantly worse than Espinosa's did.

II.     Procedural History

    A.     EEOC Charge

On July 27, 2009, Espinosa filed a Charge of Discrimination against BKC with the U.S. Equal Employment Opportunity Commission ("EEOC").  See DE 18-2 at 6.  In that charge, Espinosa alleged that during the November 2008 conference, she was "subjected to unwelcome and unwanted sexual harassment" and that her "co-workers engaged in behavior which was inappropriate and made [her] feel very uncomfortable."  Id.  Espinosa further stated that she complained to Elliot about this conduct but that "nothing was done about the situation."  Id.  In addition, Espinosa claimed that after she made this complaint, Elliot "stopped talking to [her]" and placed her on a personal improvement plan, even though her performance had been good.  Id.  Moreover, Espinosa asserted that she was "terminated in retaliation for . . . complaining about the sexual harassment" and was "replaced with one of [Elliot's] friends."  Id.  Based on these allegations, Espinosa claimed that BKC "retaliated and discriminated against [her] based on [her] sex, female[,] in violation of [T]itle VII of the 1964 Civil Rights Act as

---

[2] In her deposition, Espinosa acknowledged that Perez had visited the Restuarant three or four times in 2008 and had pointed out certain problems.  See DE 15-1 at 52, 67.  Espinosa testified, however, that she promptly corrected these issues.  See id.

4

amended." Id.

On September 15, 2009, BKC submitted a detailed written response to Espinosa's EEOC charge. See DE 18-2 at 18-29. In general, BKC denied that it subjected Espinosa to sexual harassment or otherwise discriminated against her. BKC also denied that it retaliated against Espinosa, contending that she was terminated for ongoing performance issues.

On March 21, 2011, the EEOC issued a Letter of Determination finding that Espinosa "was subjected to a sexually hostile work environment and retaliated against in violation of Title VII . . . ." DE 18-2 at 41. The EEOC found that BKC had failed to provide documents supporting its claims regarding Espinosa's poor performance and that, in fact, Espinosa had received commendations for her performance. See id. Further, the EEOC concluded that Espinosa's termination was "causally linked to her complaint" about the "unwanted sexual comments" and that Espinosa was "replaced with a lesbian woman who was a friend of Ms. Elliot." Id.

BKC requested that the EEOC reconsider its Letter of Determination, but that request was denied. See DE 18-2 at 43-49. On August 25, 2011, the EEOC issued Espinosa a Notice of Right to Sue. See id. at 51-52.

**B.    Present Action**

On November 23, 2011, Espinosa filed her *pro se* Complaint in this action. See DE 1. At the outset of the Complaint, Espinosa alleges that she is a "heterosexual female" who performed well as a BKC manager and was never "documented for poor work performance of any kind." Id. at 1.

5

The Complaint proceeds to assert a claim titled "Sexually Hostile Work Environment." See DE 1 at 1-2. In this claim, Espinosa notes that at the November 2008 conference, she was "assigned to a room with another restaurant manager, Carmen Deliz[], a fellow member of our district and a professed lesbian." Id. at 1. Espinosa alleges that during the November 4 dinner, four members of the management team, including Elliot and Haber, "revealed that they were gay" and made "lewd comments." Id. at 2. Further, Espinosa claims that Deliz, Haber, and another gay manager entered Espinosa's hotel room at 2:00 a.m. "to have a 'coming out of the closet' party which they had mentioned at dinner." Id. Because Espinosa "did not feel comfortable with this behavior," she left the room and found another place to sleep. Id. Espinosa alleges that the next morning, she complained to Elliot about the "misconduct and unprofessional behavior," and Elliot assured her (falsely) that she would handle the situation. See id.

Espinosa also pleads a claim for unlawful retaliation based on her complaint about the other managers' conduct at the conference. See DE 1 at 2. According to Espinosa, the Restaurant performed well in December 2008. See id. Yet a few weeks later, in January 2009, Elliot placed Espinosa on a personal improvement plan. See id. Espinosa alleges that Elliot cited poor work performance as the reason for Espinosa's termination in May 2009, and that the Restaurant "was given to Carmen Deliz[], professed lesbian and close friend of Kelly Elliot[] who was involved in the incident at the Atlanta managers conference." Id.

The Complaint next asserts a claim for "Sex Discrimination," in which Espinosa contends that she was "performing as well or better than the gay managers that Ms. Elliot was attempting to protect." DE 1 at 3. Espinosa identifies Deliz and a male

6

manager as gay or lesbian managers who performed poorly but were transferred to protect their jobs.  See id.

In the final section of her Complaint, Espinosa asserts that BKC's conduct violated "Title VII of the Civil Rights Act of 1964, as amended, 42 USC 2000e, 1981(sex), [and] The Florida Civil Rights Act of 1992 Chapter 760."  DE 1 at 4.  Espinosa notes that the Constitution protects basic rights for all citizens, "not only just for gay[] individuals."  Id.  She also references the "obscene and lewd behavior of BKC leadership" and the "unlawful practice of promoting and protecting transsexual and gay management over heterosexuals."  Id.  "All I wanted was to do my job and provide for my family," Espinosa states, "yet Burger King Management seemed more interested in reliving the days of Sodom and Gomorrah."[3]  Id.  Espinosa's Complaint requests injunctive relief; economic, non-economic, and punitive damages; and attorney's fees and costs.  See id. at 5.

On January 10, 2012, BKC filed an Answer to the Complaint, denying liability and asserting various affirmative defenses.  See DE 7.  BKC subsequently filed its present Motion for Summary Judgment.  See DE 13.  Espinosa then filed her Cross-Motion for Summary Judgment.  See DE 18.[4]  Both motions are now ripe for decision.

---

[3] In her deposition, Espinosa testified that the "Sodom and Gomorrah" language in her Complaint refers to homosexuality.  See DE 15-1 at 16.  The Complaint also includes other comments about the sexual orientation of BKC managers:  "Given over to vile affections, for their women changed their natural use into that which is against nature.  Likewise their men, leaving the natural use of the woman, burned in their lust one toward another, men with men working that which is unseemly."  DE 1 at 4.

[4] Espinosa's Cross-Motion is contained in the same document as her Response to BKC's Motion.  See DE 19.

**III.     Discussion**

    **A.     Summary Judgment Standard**

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must point out to the Court that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).  Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial."  Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker, 911 F.2d at 1577.  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).

The Court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In making this determination, the Court must discern which issues are material:  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248. Moreover, in deciding a summary-judgment motion, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).

### B.     Analysis of Plaintiff's Claims

Espinosa's claims in this action are based primarily on Title VII of the Civil Rights Act of 1964.  As relevant here, Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, **because of such individual's race, color, religion, sex, or national origin.**"  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  Further, Title VII prohibits an employer from "discriminat[ing] against any individual . . . because he has opposed any

9

practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).[5]

BKC's main argument in support of summary judgment is that Title VII does not apply to the discrimination and retaliation claims alleged in Espinosa's Complaint. Specifically, BKC argues that all of Espinosa's claims are based on her **sexual orientation**, which is not a protected category under Title VII. The Court agrees with BKC's position.

Espinosa's Complaint emphasizes the sexual orientation of other BKC managers and claims that they discriminated against her in various ways due to her status as a heterosexual. See supra Part II.B. Moreover, as discussed further below, Espinosa repeatedly confirmed in her deposition that her claims in this case are based solely on sexual orientation and not on gender or any other category protected by Title VII:

> Q. So the claims in this lawsuit arise from conduct involving sexual orientation?
>
> A. Sexual orientation.
>
> Q. How about gender. Does the claim have anything to do with gender?

---

[5] Espinosa's Complaint also invokes the Florida Civil Rights Act of 1992 ("FCRA"). See DE 1 at 4. Discrimination and retaliation claims under the FCRA are generally subject to the same legal standards as claims based on Title VII. As the Eleventh Circuit has explained, "[t]he Florida courts have held that decisions construing Title VII are applicable when considering claims under the [FCRA], because the Florida act was patterned after Title VII." Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) (citations omitted). The Court recognizes that the relevant provisions of the FCRA differ from Title VII in one substantive respect, namely, that the Florida statute also bans discrimination based on "age, handicap, or marital status." Fla. Stat. § 760.10(1)(a). None of these additional protected categories, however, serve as a basis for Espinosa's claims here. Accordingly, the Court's analysis of Espinosa's federal discrimination and retaliation claims applies equally to her claims under the FCRA. See Harper, 139 F.3d at 1387-90.

>       A.      No.  Just sexual orientation.
>
>       Q.      So we're clear, when you allege sex discrimination, retaliation and sexual harassment in this lawsuit, as to you, you are alleging that you were treated differently because of your sexual orientation and not because of your gender, correct?
>
>       A.      Exactly.

DE 15-1 at 16.[6]

Although neither the Supreme Court nor the Eleventh Circuit has specifically addressed this issue,[7] courts in this circuit and across the country have consistently held that Title VII does not apply to discrimination claims based on sexual orientation. See, e.g., Anderson v. Napolitano, No. 09-60744-CIV, 2010 WL 431898, at *4 (S.D. Fla. Feb. 8, 2010) ("The law is clear that Title VII does not prohibit discrimination based on sexual orientation."); Mowery v. Escambia Cnty. Utils. Auth., No. 3:04CV382-RS-EMT, 2006 WL 327965, at *9 (N.D. Fla. Feb. 10, 2006) ("[C]ase law throughout the circuits consistently holds that Title VII provides no protection for discrimination based on sexual orientation."); Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1315 (N.D. Ga. 2001) (explaining that "sexual orientation is not a classification protected

---

[6] The Court recognizes that the EEOC construed Espinosa's Charge of Discrimination as being based on gender discrimination.  See supra Part II.A. Espinosa's EEOC charge, however, did not mention sexual orientation but instead alleged that BKC "retaliated and discriminated against [her] based on [her] sex, female." DE 18-2 at 6.  By contrast, Espinosa has made clear that her claims in this action are based exclusively on sexual orientation.  Further, while the EEOC's determination letter mentions the other managers' "homosexual talk" and Deliz's status as "a lesbian woman," DE 18-2 at 40-41, the letter does not address the law concerning Title VII's application to claims based on sexual orientation.

[7] But cf. Fredette BVP Mgmt. Assocs., 112 F.3d 1503, 1510 (11th Cir. 1997) (distinguishing between actionable claims for gender discrimination arising from same-sex harassment and claims alleging discrimination based on sexual orientation).

under Title VII").[8]  For example, the Second Circuit examined the language and history of Title VII and determined that the statute "does not proscribe discrimination because of sexual orientation."  Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000).  Though recognizing that the plaintiff in Simonton suffered "appalling persecution" because of his sexual orientation, the Second Circuit nonetheless held that he could not state a claim under Title VII:

> There can be no doubt that the conduct allegedly engaged in by Simonton's co-workers is morally reprehensible whenever and in whatever context it occurs, particularly in the modern workplace.  Nevertheless, as the First Circuit recently explained in a similar context, 'we are called upon here to construe a statute as glossed by the Supreme Court, not to make a moral judgment.'  Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999).  When interpreting a statute, the role of a court is limited to discerning and adhering to legislative meaning.  The law is well-settled in this circuit and in all others to have reached the question that Simonton has no cause of action under Title VII because Title VII does not prohibit harassment or discrimination because of sexual orientation.

Id. at 35.

This Court agrees with the reasoning of these decisions and likewise concludes that claims alleging discrimination based on a plaintiff's sexual orientation are not within the purview of Title VII.  Because Espinosa's claims for harassment, retaliation, and discrimination are all based on her sexual orientation, none of those claims are viable.[9]

---

[8]  A decision of the former Fifth Circuit, holding that "[d]ischarge for homosexuality is not prohibited by Title VII or Section 1981," is consistent with the rulings of other courts regarding sexual-orientation claims generally.  Blum v. Gulf Oil Corp., 597 F.2d 936, 937 (5th Cir. 1979) (per curiam); see Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (holding that decisions of the former Fifth Circuit issued before October 1, 1981, are binding precedent in the Eleventh Circuit).

[9]  Espinosa notes that BKC maintains an anti-discrimination policy that includes sexual orientation as a protected category.  This internal policy, however, does not make BKC's alleged discrimination based on sexual orientation actionable under Title VII.  As BKC observes, the company "does not have the power to amend the coverage of federal anti-discrimination statutes."  DE 20 at 11.

The Court addresses each claim in turn below.

### 1.    Harassment

Espinosa's harassment claim is based on the events that allegedly occurred at the November 2008 conference—namely, the comments that other managers made during the November 4 dinner and the incident in the hotel room early the next morning. Based on these events, Espinosa purports to assert a claim for "Sexually Hostile Work Environment."

The Supreme Court has made clear that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). When a hostile-work-environment claim is based on gender, however, the plaintiff must show that the alleged harassment was "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1); see Oncale, 523 U.S. at 78-79. Moreover, as the Supreme Court has explained,

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discriminat[ion] . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Harris, supra, at 25, 114 S.Ct., at 372 (GINSBURG, J., concurring).

Oncale, 523 U.S. at 80 (alterations in original); see also Hudson, 209 F. Supp. 2d at 1317 ("[H]arassment is not a free-standing tort; instead, it becomes actionable only if the harassment is motivated by the gender of the victim.").

13

As discussed above, Espinosa does not allege that she was harassed "because of . . . [her] sex." Rather, she claims that the other managers subjected her to lewd comments and other behavior due to her sexual orientation. The dinner discussion that Espinosa complains of focused on the other managers' sexual preferences and experiences. See DE 15-1 at 19-21. Further, according to Espinosa's Complaint, three of the managers came to Espinosa and Deliz's hotel room later that night "to have a 'coming out of the closet' party which they had mentioned at dinner." DE 1 at 2; see also DE 18 at 19 (argument in Espinosa's summary-judgment motion that "professed gay managers . . . ascended to the Plaintiff's hotel room looking for the Plaintiff and the other heterosexuals"). Indeed, as noted above, Espinosa confirmed in her deposition that her harassment claim is based on sexual orientation. See DE 15-1 at 16; see also id. at 50 (Espinosa's testimony that she complained to Elliot about conduct involving sexual orientation, not gender or other protected traits).[10] Consequently, Title VII does not apply to Espinosa's harassment claim, and BKC is entitled to summary judgment on

---

[10] Even if Espinosa's harassment claim could be construed as one based on gender, the conduct she alleges was not "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Oncale, 523 U.S. at 78 (quoting Harris, 510 U.S. at 21). The managers' comments at the dinner were, at most, "mere offensive utterance[s]" over the course of a single 40-minute meal. Harris, 510 U.S. at 23. The conduct between Haber and the other male manager in the hotel room, while plainly inappropriate, was not directed at Espinosa. And while Deliz's drunken behavior toward Espinosa might be interpreted as a sexual advance, see Oncale, 523 U.S. at 80-81 (discussing same-sex harassment involving "explicit or implicit proposals of sexual activity"), that conduct lasted five to ten minutes at most and ended with Deliz passing out in her bed. Cf. id. at 82 (distinguishing between "simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive"). Viewed as a whole, these alleged facts do not come close to establishing a hostile-work-environment claim. See id. at 81 (explaining that Title VII is not "a general civility code" and that it "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"); see also Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999) (en banc) (discussing conduct necessary to prove actionable sexual harassment).

14

that claim.  See, e.g., Medina v. Income Support Div., 413 F.3d 1131, 1135 (10th Cir. 2005) (affirming grant of summary judgment to employer on hostile-work-environment claim because alleged harassment was based on plaintiff's hetrosexual orientation and not her gender).

### 2. Retaliation

Espinosa also claims that BKC retaliated against her for reporting to Elliot the other managers' alleged conduct in the hotel room.  To establish a prima facie case for retaliation, a plaintiff must show that: "1) she engaged in protected activity; 2) her employer was aware of that activity; 3) she suffered adverse employment action; and 4) there was a causal link between her protected activity and the adverse employment action."  Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to [her] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed."  Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997) (quoting Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989)).  The Eleventh Circuit has made clear that "[t]he objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law."  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).  This does not mean that "the conduct opposed must actually be sexual harassment, but it must be close enough to support an objectively reasonable belief that it is."  Id.

As already discussed, the alleged harassment that Espinosa complained about to Elliot was based on sexual orientation, not gender or any other protected category. Again, Espinosa conceded this point during her deposition:

15

> Q. Now, in the complaints that you made, or the complaints that you made to Kelly Elliot, did you complain to her about your race?
>
> . . .
>
> A. No.
>
> Q. Did you complain to Miss Elliot about your color?
>
> A. No.
>
> Q. Did you complain to her about your gender?
>
> A. No.
>
> Q. Did you complain to her about your religion?
>
> A. No.
>
> Q. Did you complain to her about your national origin?
>
> A. No.
>
> Q. Did you complain to her about age?
>
> A. No.
>
> Q. Did you complain to her about disability?
>
> A. No.
>
> Q. Did you complain to her about sexual orientation?
>
> A. That one, I can say yes.
>
> Q. So the complaint you did to her in November was about Carmen's and Omar's sexual orientation?
>
> A. That's the part she needs to fix it with all. . . .
>
> Q. So the complaint you made to her in retaliation was as to the sexual orientation?
>
> A. Sex orientation.

DE 15-1 at 50.

16

Because the law is clear that harassment based on sexual orientation is not prohibited by Title VII, see supra Part III.B, Espinosa could not have held an objectively reasonable belief that the conduct she complained of to Elliot was unlawful. See Hudson, 209 F. Supp. 2d at 1315 ("[B]ecause it is clear under the law that [alleged harassment based on plaintiff's sexual orientation] was not illegal, these allegations provide no support for plaintiff's claim that she had a good faith belief that she was opposing an unlawful employment practice.").[11]  Espinosa's retaliation claim therefore fails, and BKC is granted summary judgment on that claim.

### 3. Discrimination

Last, Espinosa pleads a discrimination claim alleging that BKC terminated her employment but protected gay or lesbian managers whose performance was worse than Espinosa's. To prove a prima facie claim for discrimination under Title VII, Espinosa must show that (1) she is a member of a protected class, (2) she was qualified for the job, (3) she was subjected to an adverse employment action, and (4) similarly situated employees outside the protected class received more favorable treatment than she did. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). As with her other claims, however, the basis of BKC's alleged discrimination against Espinosa was her sexual orientation—a category not protected by Title VII. Once again, Espinosa admitted this in her deposition testimony:

Q. Who discriminated against you under the sexual discrimination?

A. Kelly [Elliot].

. . .

---

[11] Nor could Espinosa have reasonably believed that she was subjected to actionable harassment based on her gender. See supra note 10.

17

Q       You're saying that Kelly Elliot discriminated against you because you are not a lesbian; is that correct?

A.      Because maybe I'm not her friend.  I'm not a lesbian, and I'm not Kelly's friend.

Q.      What do you think is the reason for the discrimination?  Was it because you are not her friend, was it because you're not a lesbian, is it both?

A.      For me, both.

Q.      That you are not her friend and you are not a lesbian?

A.      Um-hum.

Q.      Did it have anything to [do] with your national origin?

A.      No.

Q.      Your race?

A.      No.

Q.      Your gender?

A.      No.

Q.      Your sex?

A.      No.

Q.      Disability?

A.      No.

Q.      Age?

A.      No.

Q.      It has to do with because you're not her friend and you're not a lesbian?

A.      Yes.

18

DE 15-1 at 64-65.[12]

Because the discrimination Espinosa alleges is based on her sexual orientation (and possibly her personal relationship with Elliot), Espinosa cannot maintain a claim under Title VII.  The Court therefore grants summary judgment to BKC on Espinosa's discrimination claim.

## IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment [DE 13] is **GRANTED**;

2. Plaintiff's Cross-Motion for Summary Judgment [DE 18] is **DENIED**;

3. Defendant's Motion in Limine [DE 23] is **DENIED as moot**;

4. The calendar call scheduled for September 27, 2012, is **CANCELLED**, and the case is removed from the Court's October 1, 2012, trial calendar; and

5. The Court will enter a separate Final Judgment in this action.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 21st day of September, 2012.

*[signature]*
JAMES I. COHN
United States District Judge

---

[12] Apparently seeking to characterize her claim as one for gender discrimination, Espinosa argues that "the managers conforming to Kelly Elliot[]'s ideas of preferred sex (gender) roles were clearly treated better than those who rejected such behavior."  DE 18 at 15.  The only pertinent evidence that Espinosa cites to support this claim is an alleged statement by Elliot (at the November 4 dinner) regarding who is "the man" and "the woman" in her lesbian relationship.  DE 15-1 at 19.  For the reasons discussed above, however, it is clear that Espinosa's discrimination claim is based on her sexual orientation, not her failure to conform to a preferred gender role.

Copies to:

Counsel of record (via CM/ECF)

Hilda Espinosa, *pro se* (via CM/ECF mail)
11410 NW 32nd Manor
Sunrise, FL  33323